George BARGHOUT

v.

**MAYOR AND CITY COUNCIL
OF BALTIMORE, et al.**

Civ. No. L–91–141.

United States District Court,
D. Maryland.

Sept. 30, 1993.

Polydorous Paul Cocoros, and Imad Khalil Dajani, Baltimore, MD, for plaintiff.

Neal M. Janey, City Sol. for Baltimore City, Burton H. Levin, Asst. City Sol., and Susan Goering, American Civil Liberties Union of MD, amicus, for defendants.

*MEMORANDUM*

LEGG, District Judge.

This case concerns the constitutionality of a Baltimore City ("City") ordinance designed to prevent the intentional mislabelling of kosher foods. The goal of protecting the City's consumers from fraud is commendable, reasonable, and important. Purchasers of ko-

sher food should be able to rely on vendors' representations that food labelled "kosher" is indeed kosher. Unfortunately, this particular ordinance violates the Establishment Clause of the First Amendment of the United States Constitution.

Although the challenged ordinance violates the First Amendment in several ways, the primary defect is that it excessively entangles civil and religious authority. In order to prosecute any person under the ordinance, for example, the City must prove that food marketed as "kosher" is not in fact kosher. To decide this issue, courts must answer questions (perhaps esoteric ones) of orthodox Hebrew dietary law—for example, whether the suspect food or food preparation methods conform to orthodox Hebrew dietary law.[1] Under the United States Constitution, however, courts are neither equipped nor permitted to resolve such questions in the context of a criminal prosecution. Accordingly, because prosecution under the ordinance depends upon a secular court's interpretation of religious doctrine, the Court concludes that the challenged ordinance is unconstitutional.

Presently pending before the Court are the plaintiff's Motion for Summary Judgment and the defendant's Motion to Dismiss the Amended Complaint. Both motions have been fully briefed, and supplemental memoranda have been filed.[2] After considering the constitutional issues in this case, the Court will GRANT plaintiff's Motion for Summary Judgment and DENY defendant's Motion to Dismiss the Amended Complaint.

## I. FACTS

Sections 49 and 50 of Article 19 of the Baltimore City Code constitute the City's kosher fraud ordinance. Section 50 criminally punishes any person who markets food labeled "kosher" that is not in fact kosher. To be kosher under Section 50,[3] food must

1. As will be discussed, Hebrew dietary laws are neither settled nor objective. Instead, the laws of kashrut involve the interpretation of a massive body of religious literature in both Hebrew and English. Jews disagree on the interpretation of the laws of kashrut. For example, some Jews consider swordfish kosher while other Jews disagree. Courts cannot decide such religious questions. The Constitution forbids it, and respect for religion requires it.

2. The American Civil Liberties Union of Maryland ("ACLU") has filed a brief as amicus curiae.

3. In his Memorandum and Certification Order, U.S. District Judge Smalkin observed that the first sentence of section 50, which contains 500 words, "exemplifies legislative drafting at its worst." *Id.* at p. 3. In full, section 50 provides:

Any person, firm or corporation who, with intent to defraud, sells, exposes for sale, any meat or meat preparation, article of food or food products, and falsely represents the same to be Kosher, whether such meat or meat preparation, article of food or food product, be raw or prepared for human consumption, or as having been prepared under, and/or of a product or products sanctioned by the orthodox Hebrew religious rules and requirements or under the dietary laws either by direct or indirect statement, orally or in writing, which might reasonably be calculated to deceive or lead a reasonable man to believe the representations is being made that such food, meat, meat preparation or food product is kosher or prepared in accordance with the orthodox Hebrew religious rules and requirements and/or

dietary laws, or falsely represents any food products or food or the contents of any package or container to be so constituted and prepared, by having or permitting to be inscribed thereon the word "Kosher" in any language, or sells or exposes for sale in the same place of business both kosher and non-kosher food or food products, either raw or prepared for human consumption, and who fails to indicate on his window signs and all display advertising, in block letters of at least four inches in height, "Kosher and Non–Kosher Meat Sold Here," or "Kosher and Non–Kosher Food Sold Here"; or who exposes for sale in any show window or place of business both kosher and non-kosher meat or meat preparations or kosher and non-kosher food or food products, either raw or prepared for human consumption, and who fails to display over each kind of meat or meat preparations so exposed a sign in block letters at least four inches in height reading "Kosher Meat," or "Non–Kosher Meat," as the case may be, or "Kosher Food" or "Non–Kosher Food," as the case may be, or who displays on his window, door, or in his place of business or in hand bills or other printed matter distributed in or outside his premises, words or letters in Hebraic or other characters, or any sign, emblem, insignia, six point star, symbol or mark in simulation of same, without displaying in conjunction therewith in English letter of at least the same size as such characters, signs, emblems, insignia, symbols or mark, the words "We sell Kosher meat and food only" or "We sell Non–Kosher meat and food only" or "We sell both Kosher and Non–Kosher meat and food," as the case may be is

conform to orthodox Hebrew dietary rules. Article 19, § 49(e). Violations of the ordinance are considered misdemeanors "punishable by a fine of not less than fifty dollars ($50.00) or more than five hundred dollars ($500.00) or by imprisonment of not less than thirty (30) days or more than one (1) year, or both, at the discretion of the Court." *Id.* § 50.

The ordinance also establishes a six-person "Bureau of Kosher Meat and Food Control" ("Bureau") whose duties include inspecting the premises, records, equipment, and products of all places engaged in the manufacture, preparation, sale, or distribution of food which is represented to the public as "kosher." *Id.* § 49(e). The Bureau must consist of three duly ordained orthodox Rabbis and three laymen who are selected from a list submitted by "The Council of Orthodox Rabbis of Baltimore" and "The Orthodox Jewish Council of Baltimore." *Id.* § 49(a). The Mayor of the city of Baltimore appoints all six members of the Bureau, and they receive no compensation for their services. *Id.* Pursuant to statute, they must be chosen for their "expert knowledge and interest in the orthodox Hebrew rules, regulations and requirements pertaining to the sale, manufacture, distribution and preparation of kosher food." *Id.* § 49(b). In "administering and enforcing" the ordinance, the Bureau may hire an inspector for the "proper performance of [the Bureau's] duties and enforcement of the law." *Id.* §§ 49(e), 49(g). The Bureau shall report any violations of the ordinance to the Mayor and/or other law enforcement authority. *Id.* § 49(h).

The plaintiff George Barghout, whose sale of kosher food resulted in this litigation, owned and operated an establishment called "Yogurt Plus" in a Baltimore shopping mall.[4]

On September 1, 1989, the Bureau received a complaint that Yogurt Plus was violating kosher laws. Later that day, the Bureau dispatched its inspector, Rabbi Mayer Kurefeld, to investigate the complaint.

When he arrived at Yogurt Plus, Rabbi Kurefeld noticed an electric sign outside Yogurt Plus advertising "kosher hot dogs." Inside the store, the menu board also indicated that the store offered "kosher" hot dogs for sale. The inspector determined, however, that the "kosher" hot dogs were not actually kosher. Although there was nothing wrong with the hot dogs upon removal from the package, Rabbi Kurefeld explained that Barghout's method of hot dog preparation robbed the kosher hot dogs of their kosher status.

Specifically, the kosher hot dogs had been placed on a rotisserie next to non-kosher sausages and hot dogs. According to Rabbi Kurefeld, this cooking method permits grease from the sausages and non-kosher hot dogs to touch the kosher hot dogs. Rabbi Kurefeld explained that kosher food loses its kosher status if tainted by grease from non-kosher food. Rabbi Kurefeld stated that he advised Barghout "that a person is paying more money for kosher and ... deserves to get what he pays for and that's the intent of the law." Selling "kosher hot dogs" undeserving of that designation constitutes false advertising, the inspector concluded. Accordingly, Rabbi Kurefeld issued a violation warning to Barghout, who refused to sign it. The inspector also informed Barghout that he would be given time to correct the problem.

On October 11, Rabbi Kurefeld returned to Yogurt Plus and discovered that, even

---

guilty of a misdemeanor punishable by a fine of not less than fifty dollars ($50.00) or more that five hundred dollars ($500.00) or by imprisonment of not less than thirty (30) days or more than one (1) year, or both, at the discretion of the Court. Possession of non-kosher meat and food, in any place of business advertising the sale of kosher meat and food only is presumptive evidence that the person in possession exposes the same for sale with intent to defraud, in violation of the provisions of this section. In order to comply with the provisions of this section persons dealing with ei-

ther kosher meat, meat preparations, food and/or food products only, or persons dealing with both kosher and non-kosher meat, meat preparations, food and/or food products must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws; otherwise he shall be in violation of this section.
*Id.* § 50.

4. The factual record comes from the opinion of the Court of Appeals of Maryland in *Barghout v. Mayor*, 325 Md. 311, 600 A.2d 841, 843 (1992).

though the City Solicitor's office had also sent Barghout a warning letter, the problem had not been corrected. The inspector then issued another violation warning to Barghout. According to the rabbi's testimony, he came back twice again—on November 24, 1989, and May 15, 1990—only to discover that the cooking methods had not changed. Barghout was issued yet another warning letter; he was also charged with violating the ordinance.

On November 15, 1990, a judge of the District Court of Maryland for Baltimore City found Barghout guilty of violating Article 19, Section 50. The vendor was fined $400 plus $100 in court costs. Two months later, Barghout sought a declaratory judgment from the United States District Court for the District of Maryland that Article 19, Sections 49 and 50 of the Baltimore City Code violated the First and Fourteenth Amendments of the United States Constitution. The vendor asserts that both Sections 49 and 50 are "unconstitutionally vague for want of any ascertainable standard of guilt"[5] and that they violate the Establishment Clause of the United States Constitution. *See* Amended Complaint ¶¶ 8, 10, 11.

On May 31, 1991, Judge Frederic N. Smalkin certified two questions to the Court of Appeals of Maryland. *See* Md.Cts. & Jud. Proc.Code Ann. § 12–601 (1989).

I. Can an individual be convicted of violating Article 19, § 50 of the Baltimore City Code, if he or she sincerely believes that his or her conduct conforms to kosher requirements, even though the City inspector may disagree, or even though the individual's conduct might in fact be violative of religious laws?

II. Does Article 19, § 50 of the Baltimore City Code violate Article 36 of the Declaration of Rights of the Constitution of Maryland?

*Barghout v. Mayor,* 325 Md. 311, 600 A.2d 841, 841–42 (1992).[6]

Answering the first question in the negative, the Court of Appeals found that Section 50 is "meant to punish only those who knowingly deceive customers who buy products labeled as kosher but which the vendors do not believe are up to that standard." *Barghout,* 600 A.2d at 844. The Court stated that the law is "not designed to punish sellers who honestly but incorrectly believe that their products are kosher." *Id.* Vendors who "sincerely believe" that their food products meet the requirements of the statute do not violate the ordinance. *Id.* 600 A.2d at 845.

The Court of Appeals also answered the second question in the negative, concluding that "nothing in Baltimore's kosher food ordinance inhibits the free exercise of religion guaranteed under Article 36 of the Maryland Declaration of Rights." *Barghout,* 600 A.2d at 848. The Court noted, however, that "Article 36 does not contain an establishment clause, which would prohibit government from setting up a church, giving preferential treatment to any religion or coercing belief or disbelief in any religion." *Id.* 600 A.2d at 849. The Maryland Court of Appeals, therefore, did not (and could not) decide the Establishment Clause issue under the Maryland Constitution. Accordingly, this Court must analyze that issue under the First Amendment of the United States Constitution.

Before undertaking such an analysis, however, the Court must briefly explain the import of the term "kosher," which means "fit" or "ritually correct" and refers to the Jewish

**5.** In Count III of the Amended Complaint, the plaintiff alleges that the terms "kosher" and "orthodox Hebrew religious rules and regulations" are unconstitutionally vague for want of any ascertainable standard of guilt. In light of the Court's analysis of the Establishment Clause claim, we need not determine whether the terms are in fact unconstitutionally vague. The Court notes, however, that other courts, including the United States Supreme Court, have concluded that the term "kosher" is not unconstitutionally vague. *See, e.g., Hygrade Provision Co. v. Sherman,* 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402

(1925); *Erlich v. Municipal Court of Beverly Hills Judicial Dist.,* 55 Cal.2d 553, 360 P.2d 334 (1961); *People v. Atlas,* 183 A.D. 595, 170 N.Y.S. 834, 835–36 (1918), *aff'd,* 230 N.Y. 629, 130 N.E. 921 (1921).

**6.** In his Memorandum and Certification Order, Judge Smalkin wrote that the difficult issue in the case is whether the ordinance fosters excessive government entanglement with religion. *Id.* at p. 4.

dietary laws. *Ran–Dav's County Kosher, Inc. v. State,* 129 N.J. 141, 608 A.2d 1353, 1355 (1992) (holding a similar kosher fraud statute unconstitutional), *cert. denied,* —— U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993). The collective term for these laws and customs is the Hebrew word "kashrut." 6 *Encyclopaedia Judaica* 27 (MacMillan Publishing Co. 1971). The rules of kashrut are derived from biblical statute, rabbinic interpretation and legislation, and custom. 8 *Encyclopedia of Religion* 271 (MacMillan Publishing Co. 1987). Most biblical allusions regarding kashrut are found in the Old Testament books of Leviticus, Deuteronomy, Genesis, and Exodus. *Id.* The rules of kashrut pertain to permitted and forbidden animals, forbidden parts of otherwise permitted animals, the method of slaughtering and preparing permitted animals, forbidden food mixtures, and other various prescriptions regarding the propriety and fitness of food for consumption. *Id.* at 270–71. These rules are complex, and the literature devoted to kashrut, both in English and in Hebrew, is enormous. *Id.* at 273.

The sects of Orthodox and Conservative Judaism both insist on the observance of kashrut. *Id.* at 272. Although Conservative and Orthodox Jews generally agree on the standards of kashrut, they differ in their interpretations of specific provisions. *See generally,* 6 *Encyclopaedia Judaica* at 27–45. Some Reform Jews follow various rules of kashrut, but they generally do not regard kashrut as binding. *Id.* This disagreement among some of the various Jewish sects affects determinations about the kosher status of particular foods and methods of food preparation. For example, some Jews consider swordfish to be kosher while others disagree. Numerous other examples of kosher interpretive disagreement also exist. *See* Plaintiff's Response to Defendant's Motion to Dismiss, p. 5.; Brief as Amicus Curiae ACLU, p.

12–14. Thus, the rules of kashrut are neither settled nor objective.

## II. *DISCUSSION*

### A. *Establishment Clause Jurisprudence*

The Establishment Clause of the First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion." Generally, the clause was designed to protect against the sponsorship, financial support, and active involvement of a sovereign government in religious activities.[7] *Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). Thus, the Supreme Court has often described the Establishment Clause as erecting a "wall" between church and state. *See, e.g., Everson v. Board of Educ. of Ewing,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947).

■ Although the concept of a wall is a useful metaphor, the Supreme Court has also stated that "the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship [between government and religion]." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Even if the demarcation between church and state is elastic, the Supreme Court has stated that the fundamental import of the Establishment Clause is unyielding:

> Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person ... to profess a belief or disbelief in any religion.... Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*

*Everson,* 330 U.S. at 15–16, 67 S.Ct. at 511–12. That is, "[g]overnment may neither pro-

---

**7.** Animating the Establishment Clause are several principles:

> We have believed that religious freedom cannot exist in the absence of a free democratic government, and that such a government cannot endure when there is a fusion between religion and the political regime. We have believed that religious freedom cannot thrive in the absence of a vibrant religious community and that such a community cannot prosper when it is bound by the secular.

*Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2667, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring).

mote nor affiliate itself with any religious doctrine or organization, nor may it obtrude itself in the internal affairs of any religious institution." *Lee v. Weisman,* — U.S. —, —, 112 S.Ct. 2649, 2661–62, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring).

■ On the other hand, the *proper* relationship between church and state, according to the Supreme Court, is one of "accommodation." *Lee,* — U.S. at —, 112 S.Ct. at 2655. "The First Amendment does not prohibit practices which ... create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact." *Id.* at —, 112 S.Ct. at 2661 (quoting *School Dist. of Abington v. Schempp,* 374 U.S. 203, 308, 83 S.Ct. 1560, 1616, 10 L.Ed.2d 844 (1963)). The principle that government may accommodate the free exercise of religion, however, "does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee,* — U.S. at —, 112 S.Ct. at 2655.

■ Analysis under the Establishment Clause has always been a "delicate and fact sensitive" area of law. *Id.* at —, 112 S.Ct. at 2661. The Supreme Court has "repeatedly emphasized [an] unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). Notwithstanding the apparent aversion to a single mode of analysis, the Supreme Court has often used the three-pronged *Lemon* test in deciding Establishment Clause issues. *Lemon,* 403 U.S. at 612–23, 91 S.Ct. at 2111–16. Under *Lemon,* a judge determines (1) whether the challenged law has a secular purpose, (2) whether its principal or primary effect is to advance or inhibit religion, and (3) whether it

creates an excessive government entanglement with religion. *Id.* All three prongs must be satisfied for the statute to be constitutional. The Supreme Court has stressed, however, that the standard articulated in *Lemon* "provides no more than a helpful signpost in dealing with Establishment Clause challenges." *Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983) (quoting *Hunt v. McNair,* 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)).

After analyzing the purpose of the challenged ordinance, this Court will focus primarily on the entanglement prong because, in the Court's view, therein lies the ordinance's principal defect. The Court will conclude with an examination of the effects prong.[8]

B. *The Purpose Prong of Lemon*

■ Under the first prong of the *Lemon* analysis, this Court must decide whether the challenged ordinance has a valid secular purpose.[9] The Supreme Court has held that a statute lacks a secular purpose only if it is wholly motivated by religious considerations. *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362. Further, if the legislature, in enacting the suspect statute, has articulated a secular purpose that is plausible, a court should defer to that determination. *Wallace v. Jaffree,* 472 U.S. 38, 74–75, 105 S.Ct. 2479, 2499, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring); *see also Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). Thus, even if a challenged statute substantially benefits a particular religion, there is no encroachment on the first prong of *Lemon* so long as there is a plausible secular pur-

---

**8.** Although the plaintiff in this case asserts both "facial" and "as applied" challenges to Sections 49 and 50, "few ... cases in the Establishment Clause area have explicitly distinguished between facial challenges to a statute and attacks on the statute as applied." *Bowen v. Kendrick,* 487 U.S. 589, 600, 108 S.Ct. 2562, 2569, 101 L.Ed.2d 520 (1988). The Supreme Court has decided both types of Establishment Clause cases. *See, e.g., Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (facial challenge);

*Bowen,* 487 U.S. at 601, 108 S.Ct. at 2570 (as applied challenge). In this case, the Court will apply each of the three prongs of the *Lemon* test to both the language of the challenged sections and the manner of their application.

**9.** In his Memorandum and Certification Order, Judge Smalkin wrote that the ordinance "is nothing more than a consumer protection law." *Id.* at p. 4.

pose. *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362.

In this case, the City of Baltimore argues that the statute and its accompanying administrative scheme address the valid secular goal of preventing and punishing fraud and protecting consumers. Indeed, preventing fraud is the ordinance's "sole purpose." Defendant's Motion to Dismiss, p. 22. Further, the City asserts that "[t]he sale of kosher food is an activity without religious significance." *Id.*

The Court concludes that the prevention of fraud represents a "plausible secular purpose" and will defer to that legislative goal. Therefore, although the statutes provide a substantial religious benefit to those who adhere to "orthodox Hebrew religious rules and dietary laws," the existence of a plausible secular purpose for the challenged ordinance satisfies the first prong of the *Lemon* test.[10]

### C. *The Entanglement Prong of Lemon*

Under the third prong of the *Lemon* test, the Court must determine whether the statute "foster[s] an excessive government entanglement with religion." *Lemon,* 403 U.S. at 613, 91 S.Ct. at 2111 (citation omitted). The Supreme Court has recognized that the issue of entanglement is a "question of kind and degree" and that some relationship between government and religion is inevitable. *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365. The Supreme Court has also stated that excessive entanglement "may interfere with the independence of the institutions, give the institutions access to government or government powers not fully shared by non-adherents of the religion, and foster the creation of

political constituencies defined along religious lines." *Id.* 465 U.S. at 688, 104 S.Ct. at 1367. The dangers of such an entanglement, the Court has opined, jeopardize the basic tenets of democracy. "When secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government." *Schempp,* 374 U.S. at 295, 83 S.Ct. at 1610 (Brennan, J., concurring).

In the present case, the challenged ordinance directly and substantially entangles the government in religious matters in two fundamental ways. First, the regulations impose a wholly religious standard for compliance. Second, the regulations mandate the excessive involvement of specific religious organizations and figures in interpreting and enforcing these standards. That is, as civil servants selected for their knowledge of orthodox Hebrew custom, the six Bureau members identify violations of *religious* law punishable through *civil* enforcement. The Court now proceeds to examine each of these instances of excessive entanglement.

First, as to the ordinance's enforcement standard, the ordinance provides that "[i]n order to comply with the provisions ... food and/or food products must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws; otherwise [there] shall be [a] violation of this section." Article 19, § 50. As the defendant acknowledges, every prosecution requires the government to establish that the food in question is not "kosher."[11] In determining

---

**10.** This conclusion is not entirely free from doubt. As the Supreme Court of New Jersey noted when analyzing a similar kosher fraud statute, "[t]he conceptual difficulty with that conclusion is that although the objective of the regulation is to protect against fraudulent sales, the focus of the enforcement provision is not so limited.... *The regulations may have been designed to assure truth in marketing, but the truths being marketed are, in essence, religious truths."* *Ran–Dav's,* 608 A.2d at 1366 (emphasis added). That Court ultimately deferred to the State's argument that preventing fraud constituted the statute's valid secular purpose. *Id.*

**11.** This element of the prosecution is distinct from an examination of a defendant's intent to defraud. The Court of Appeals of Maryland found that, in order to violate the statute, a purveyor of kosher food must have the intent to defraud and that this intent would be a principal issue in a prosecution. *Barghout,* 600 A.2d at 844–45. That a defendant's intent is the principal inquiry does not, however, affect the government's burden of establishing that the food was not "kosher."

The defendant attempts to distinguish this ordinance from the New Jersey kosher fraud statute held unconstitutional in *Ran–Dav's.* 608 A.2d at

whether the food is indeed kosher, the government must apply the kosher standard dictated by the statute. This standard requires the application of "orthodox Hebrew religious rules and regulations and dietary laws." Thus, in *every* prosecution, the government necessarily must interpret and apply a standard which expressly embraces the tenets of a particular religious sect. The City's adoption and enforcement of this standard is "precisely what makes the regulations religious, and is fatal to its scheme." *Ran–Dav's*, 608 A.2d at 1360 (holding that New Jersey's "kosher" fraud regulations impose a substantive religious standard that excessively entangles the state in religious matters). "The entanglement test ... forbids government adoption and enforcement of religious law." *Id.* at 1362. The Court concludes that the City's adoption of a religious standard punishable by civil enforcement entangles the government in religious doctrine.

In addition to adopting an unconstitutional religious standard, the ordinance substantially entangles the courts in the morass of religious doctrine. A court would be called upon to decide whether the challenged actions depart from the specified kosher standard—namely, orthodox Jewish religious dietary laws. In reaching such a decision, a court would be required to interpret religious doctrine. Such a court would be making a purely religious determination about what practices are kosher. *See Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 450–51, 89 S.Ct. 601, 606–07, 21 L.Ed.2d 658 (1969).

In this case, for example, the plaintiff asserts that he sincerely believes that his cooking methods are kosher and that the items labeled "kosher hot dogs" were indeed kosher. *See* Plaintiff's Supplemental Memorandum in Support of Motion for Summary Judgment, p. 8. Rabbi Kurefeld disagreed and warned Barghout that his cooking practices were not kosher. On the basis of those warnings, Barghout was charged with violating the ordinance. Because this determination is a primary element of the prosecution's case-in-chief in any case, *see* Defendant's Motion to Dismiss, p. 29, a Bureau member or inspector must testify as to the kosher status of the challenged practices. Further, if, as in this case, an inspector testifies that the suspect practices are not kosher and the defendant disagrees, the Court must decide whether these practices are indeed kosher. If the Establishment Clause means anything, it means that civil servants—such as this Court and the six appointed members of the Bureau—may not determine whether food is kosher for the purpose of prosecuting a vendor of kosher food.

The Supreme Court has asserted that it is "wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions." *Presbyterian Church*, 393 U.S. at 445–46, 89 S.Ct. at 604. The Court has also stated that government "must be neutral in matters of religious theory, doctrine, and practice ... and it may not aid, foster, or promote one religion or religious theory." *Epperson v. Arkansas*, 393

1355. The Baltimore City ordinance, according to the Maryland Court of Appeals, does not punish those who "sincerely believe" that the challenged food is kosher. *Barghout*, 600 A.2d at 845. The New Jersey statute, according to the New Jersey Supreme Court, punishes all vendors of non-kosher foods marketed as "kosher," regardless of the vendors' opinions about the challenged practices. *Ran–Dav's*, 608 A.2d at 1363. The defendant argues that vendors in Baltimore City, unlike those in New Jersey, are not subject to esoteric or debatable kosher determinations by Bureau members; therefore, the Bureau members, as civil servants, are not making religious determinations. Thus, the ordinance is constitutional, defendant argues, because there is neither advancement of a religion nor entanglement with government.

The Court rejects this argument and concludes that the "sincere belief" mens rea of the ordinance does not affect its unconstitutionality. First, as the defendant concedes, every prosecution requires that the City prove that the food is not kosher. Thus, even though the statute does not impose strict liability, the City—and the courts—must still decide whether the challenged food is kosher. Second, as the plaintiff argues, in order to determine whether the vendor possessed a "sincere belief" that his food was kosher, a court must inquire into the basis of the vendor's belief. Such an inquiry requires a court to decide what quasi-kosher practices might reasonably result in a sincere belief. Otherwise, prosecuting ordinance violations would consist *solely* of asking the vendor one question: "Is your belief sincere?"

U.S. 97, 103–104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). The commitment to neutrality "stems from a recognition ... that powerful sects or groups might bring about a fusion of governmental and religious function or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies." *Schempp,* 374 U.S. at 222, 83 S.Ct. at 1571.

The defendant argues that in applying the ordinance's "orthodox Hebrew religious" standard, courts need only resort to neutral principles of criminal law. Further, the defendant adds that the "kosher" standard is objective and established.[12] The Court rejects both arguments. Religious rules and regulations do not become "neutral" principles simply because they are clear or universally held. In addition, even if "orthodox Jewish dietary laws" were well settled they would not be devoid of religious significance. Whether settled or not, a religious law remains a religious law, and a court cannot be called upon either to interpret or to apply such a standard. Accordingly, the Court concludes that the challenged ordinance, which mandates an orthodox Hebrew standard for kosher, is "inextricably intertwined" with secular law and government entities. *See Ran–Dav's,* 608 A.2d at 1360.

The second use of excessive entanglement concerns the relationship between the city of Baltimore and Orthodox Jewish individuals and organizations. As previously noted, the enforcement provision of the statute provides for the creation of a six-member "Bureau of Kosher Meat and Food Control." The ordinance dictates that three members of the Bureau shall consist of duly ordained Orthodox rabbis and that three laymen shall be selected from a list submitted by "The Council of Orthodox Rabbis of Baltimore" and the "Orthodox Jewish Council of Baltimore." Article 19, § 49. The Bureau may also employ an inspector such as Rabbi Kurefeld for "the proper performance of [the Bureau's] duties and enforcement of the law."

Under the challenged City scheme, the members of the Bureau and the inspector are chosen for their religious expertise, education, and training in interpreting, applying, and enforcing kosher regulations. *Cf. Ran–Dav's,* 608 A.2d at 1361 (asserting that "the existence of an Advisory Committee composed predominantly of orthodox rabbis underscores the theological or religious nature of the State's regulatory endeavors"). That these individuals are interpreting and enforcing a religious standard shows that they are "being used by and for" the City "in their religious capacity."[13] *Id.* at 1365. The "religious and civil authority possessed by them is virtually indistinguishable." *Id.* As one poet has written, "[h]ow can we know the dancer from the dance?"[14]

By excessively entangling the City, the Orthodox Jewish Councils, the inspector, and vendors such as Barghout, this ordinance creates "detailed monitoring and close administrative contact" between secular and religious bodies. *Aguilar v. Felton,* 473 U.S. 402, 414, 105 S.Ct. 3232, 3239, 87 L.Ed.2d 290 (1985). Further, the ordinance necessitates the "official and continuing surveillance" of religious practices. *Walz,* 397 U.S. at 675, 90 S.Ct. at 1414. This Court concludes that the Establishment Clause prohibits precisely this type of excessive government entanglement with religion.

### D. *The Effects Prong of Lemon*

■ Under the second prong of the *Lemon* test, the Court must determine whether

---

12. *But see supra* Section I (discussing the indeterminate kosher status of swordfish). The defendant compares the term "kosher" to any other term used on any product for marketing purposes. Defendant's Motion to Dismiss, p. 28 n. 10 (citing *El Moro Cigar Co. v. FTC,* 107 F.2d 429 (4th Cir.1939) (holding that the FTC could require a cigar manufacturer to desist from using the word "Havana" used to describe cigars not made from Cuban tobacco)). Unlike "kosher," the term "Havana" is secular and is thus inapposite.

13. Furthermore, the two orthodox Jewish Councils are given the authority to provide a list of candidates from which the City *must* choose the three lay members of the Bureau. The councils' ability to determine who will serve on a City agency further entangles the councils in the machinery of a civil enforcement scheme. In addition, courts would be called upon to decide who is an orthodox Jew.

14. William Butler Yeats, "Among School Children."

the statute's principal or primary effect advances or inhibits religion.[15] *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111. In evaluating the effects of challenged statutes, the Supreme Court has stated that "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." *Lynch,* 465 U.S. at 683, 104 S.Ct. at 1364 (quoting *Nyquist,* 413 U.S. at 771, 93 S.Ct. at 2964). Rather, statutes violate the effects prong when the statute "fosters a close identification of [the government's] powers and responsibilities with those of any—or all—religious denominations." *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 389, 105 S.Ct. 3216, 3225, 87 L.Ed.2d 267 (1985). An identification of state power with religious practice advances that religion and may inhibit other religions as well. *Id.*

■ Prohibited government practices include those having the effect of communicating a message of government endorsement or disapproval of any religion or religious beliefs. *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). This position stems from a fear that "[e]ndorsement sends a message to non-adherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Id.* at 688, 104 S.Ct. at 1367.

This Court must decide whether the statute, which defines "kosher" as conforming with Orthodox Jewish dietary laws, conveys the message that the City of Baltimore endorses the Orthodox Jewish religion or Orthodox Jewish laws, thereby having the effect of advancing that religion. The City argues that the ordinance has no such effect and that "[k]osher food, in and of itself, has no religious significance." The Maryland

Court of Appeals agreed. *See Barghout,* 600 A.2d at 847. The plaintiff counters that the ordinance advances religion "by elevating the laws of Kosher to legal status" and that the ordinance "expressly adopts the 'Orthodox Hebrew religious rules' as the preferred religious standard." Plaintiff's Motion for Summary Judgment, p. 4. The Court concludes that the plaintiff is correct.

While the City argues that kosher food has no religious significance, the City also states that "[i]t is the *observance of the dietary laws* themselves ... which implicates Jewish religious beliefs." Defendant's Motion to Dismiss, p. 5 (emphasis added). Ironically, this is precisely why the ordinance is unconstitutional, for the kosher status of suspect food depends on whether orthodox dietary laws have been observed. And Sections 49 and 50 codify these orthodox Hebrew dietary rules and regulations. Such a codification is, quite literally, an endorsement of orthodox Judaism, for the City has effectively placed its stamp of approval on orthodox Judaism. Further, violations of "orthodox Hebrew *religious* rules" are considered violations of Baltimore *City* law. Article 19, § 50 (emphasis added). This confluence of church and state communicates a message of endorsement that advances the prestige, credibility, and influence of Orthodox Judaism.[16]

In addition, Conservative or Reform Jews might well object to the status conferred on Orthodox Jews, for the ordinance identifies a orthodox Judaism as the recipient of civil authority for interpreting and applying the kosher standard. Such privileging inevitably advances Orthodox Judaism.

The City correctly suggests that the statutes themselves do not express a position on the theological merits of the Orthodox Jewish religious laws. The Supreme Court has as-

**15.** In his Memorandum and Certification Order, Judge Smalkin concluded that "the Court sees little difficulty with the second prong, because the law neither advances nor inhibits religion." *Id.* at p. 4. Judge Smalkin appears to have focused almost exclusively on the third *Lemon* prong. This Court will examine both the second and third *Lemon* prongs.

**16.** In *Ran–Dav's,* the Supreme Court of New Jersey reached the same conclusion in analyzing

a similar kosher fraud statute. 608 A.2d at 1365. "Such a close identification [between the government's powers and any religion] plainly is fostered by the enforcement of the kosher regulations, for the State adopts religious law as its own." *Id.* at 1364.

The *Ran–Dav's* Court also concluded that the challenged statute excessively entangled the government and a particular religious sect. *Id.*

serted, however, that even a symbolic union of church and state violates the Establishment Clause. *Grand Rapids,* 473 U.S. at 390, 105 S.Ct. at 3226. In *Larkin v. Grendel's Den, Inc.,* for example, the Supreme Court observed that "the mere appearance of a joint exercise of legislative authority by Church and State provides significant benefit to religion in the minds of some by reason of the power conferred." 459 U.S. 116, 125–26, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982).

In this case, the ordinance creates, at the very least, a symbolic union of church and state. Civil servants, serving in their religious capacity, enforce religious standards through the exercise of civil authority. The effect is *not* to protect religious beliefs generally but instead to protect the tenets and rituals of Orthodox Judaism.[17] The Establishment Clause forbids precisely this type of endorsement.[18]

Accordingly, this Court concludes that the challenged statutes have the unconstitutional effect of advancing a particular religion.

## III. *CONCLUSION*

The Court finds that the challenged ordinance embraces the valid secular purposes of preventing consumer fraud. This conclusion will not save this ordinance, however, for the ordinance excessively entangles the government in kosher doctrine and also advances orthodox Judaism.

The Baltimore City ordinance's valid secular objectives can be accomplished by other means.[19] Such legislation would make denominational preferences unnecessary, re-

move the problems of entangling religious and governmental entities, and better serve both the City and those who adhere to "orthodox Hebrew religious" laws.

Thus, the Court holds that the City's kosher fraud statute and its accompanying administrative scheme, Baltimore City Code Article 19, Sections 49 and 50, are unconstitutional under the Establishment Clause of the First Amendment of the United States Constitution. The plaintiff's Motion for Summary Judgment will be granted by separate order.

### *ORDER*

For the reasons stated in the Memorandum of even date, IT IS SO ORDERED, this 30th day of September, 1993, that:

1) the plaintiff's Motion for Summary Judgment is hereby GRANTED, and the defendant's Motion to Dismiss the Amended Complaint is hereby DENIED;

2) Article 19, Sections 49 and 50 of the Baltimore City Code are hereby declared UNCONSTITUTIONAL under the First Amendment of the United States Constitution;

3) the plaintiff's conviction in the District Court for Baltimore City pursuant to Article 19, Sections 49 and 50 of the Baltimore City Code is hereby declared UNCONSTITUTIONAL;

4) the City of Baltimore is hereby ENJOINED from inspecting, warning, charging with a violation, and/or prosecuting any person under Article 19, Sections 49 and 50 of

---

17. This type of preference is not only inconsistent with the second prong of *Lemon,* but it also violates the standards enumerated by at least one Supreme Court Justice who has been critical of the traditional *Lemon* analysis. *See Wallace,* 472 U.S. at 113, 105 S.Ct. at 2519 (Rehnquist, J., dissenting) ("The [Establishment] Clause was designed to stop the ... Government from asserting a preference for one religious denomination or sect over others.").

18. As the New Jersey Supreme Court stated in analyzing the symbolic union of church and state created in a virtually identical kosher fraud statute, "[b]ecause [the kosher regulations] work both as a constraint and as an inducement on merchants who must abide by them and on consumers who cannot avoid them, the primary, if

not exclusive, effect of the regulatory process necessarily is to advance particular religious tenets." *Ran–Dav's,* 608 A.2d at 1364.

19. Such an ordinance could require vendors of kosher foods to identify the organization or persons who have verified the kosher status of the food. The City could then prosecute only those vendors whose food was not in fact certified as kosher by the named organization or person. Thus, a prosecution for kosher fraud would focus not on whether the challenged food is kosher but whether the kosher-certifying organization actually certified the food. *See, e.g.,* Mark A. Berman, Note, *Kosher Fraud Statutes and The Establishment Clause: Are They Kosher?,* 26 Colum.J.L. & Soc.Probs. 1, 71–73 (1992) (proposing a model kosher fraud ordinance).

the Baltimore City Code until said statutes are reformulated in a manner consistent with this opinion.