**George BARGHOUT, Plaintiff–Appellee,**

**v.**

**BUREAU OF KOSHER MEAT AND FOOD CONTROL; Mayor and City Council of Baltimore; Mayer Kurefeld, Rabbi, Defendants–Appellants,**

**and**

**Joseph Nelkin, Chairman; Joseph Robison, Individually and in official capacity as Mayor of Laurel, Defendants.**

**The National Jewish Commission on Law and Public Policy, Amicus Curiae.**

**No. 94–1918.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 8, 1994.

Decided Oct. 2, 1995.

**ARGUED:** Burton Harry Levin, Assistant Solicitor, Baltimore, Maryland, for Appellants. Ronald Kevin Chen, Rutgers Constitutional Litigation Clinic, Rutgers Law School, Newark, New Jersey, for Appellee. **ON BRIEF:** Neal M. Janey, City Solicitor, Baltimore, Maryland, for Appellants. Susan Goering, American Civil Liberties Union of Maryland, Baltimore, Maryland, for Appellee. Nathan Lewin, Stuart Levey, Miller, Cassidy, Larroca & Lewin, Washington, D.C.; Dennis Rapps, National Jewish Commission On Law and Public Affairs, New York City, for Amicus Curiae.

Before WILKINS and LUTTIG, Circuit Judges, and LAY, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion. Senior Judge LAY filed an opinion, in which Judge WILKINS concurs. Judge LUTTIG filed an opinion concurring in the judgment, in which Judge WILKINS concurs. Judge WILKINS filed a concurring opinion.

## OPINION

LAY, Senior Circuit Judge:

The question before us is whether a Baltimore municipal ordinance prohibiting the fraudulent sale of kosher food violates the Establishment Clause of the First Amendment.

### BACKGROUND

The Baltimore ordinance at issue, Baltimore, Md., City Code art. 19, §§ 49–52 (1983), makes it a misdemeanor to, "with intent to defraud," offer for sale any food labeled kosher, or indicating compliance "with the orthodox Hebrew religious rules and requirements and/or dietary laws," when the food does not in fact comply with those laws. *Id.* at § 50. The ordinance further states as follows:

In order to comply with the provisions of this section persons dealing with either kosher meat, meat preparations, food and/or food products only, or persons dealing with both kosher and non-kosher meat, meat preparations, food and/or food products *must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws;* otherwise he shall be in violation of this section.

*Id.* (emphasis added). To aid in its enforcement, the ordinance creates an unpaid Bureau of Kosher Meat and Food Control. *Id.* at § 49(a). Members of the six-person Bureau are appointed by the Mayor and must include three duly ordained Orthodox Rabbis and three laymen selected from a list submitted by "The Council of Orthodox Rabbis of Baltimore" and "The Orthodox Jewish Council of Baltimore." *Id.* Duties of the Bureau include inspecting slaughter houses, butcher shops, and other establishments offering kosher food for sale "with the view and purpose of administering and enforcing the laws and rules relating to the possession, sale, manufacture, preparation and exposure for sale of kosher meats, meat preparations, food and food products in accordance with the orthodox Hebrew religious rules and requirements and dietary laws. . . ." *Id.* at § 49(e). In addition, the Bureau is to report violators to the Mayor or other law enforcement authorities. *Id.* at § 49(h). The Bureau is authorized to employ a paid inspector to aid in carrying out its duties. *Id.* at § 49(g).

George Barghout is the owner and operator of a business called "Yogurt Plus" in Baltimore, which offers both kosher and nonkosher foods for sale. On September 1, 1989, the Bureau's paid inspector, Rabbi Mayer Kurefeld, investigated a complaint that Barghout was violating the ordinance. Rabbi Kurefeld's inspection revealed that Barghout placed kosher hot dogs on a rotisserie next to nonkosher hot dogs. This arrangement allowed grease from the nonkosher meat to contaminate the kosher hot dogs, rendering them nonkosher. Rabbi Kurefeld wrote up a violation warning, but Barghout refused to sign it. The record reflects that the inspector returned to Yogurt Plus three more times over the next few months. Each time, the inspector discovered that Barghout continued the practice of placing kosher hot dogs on a rotisserie with nonkosher meat. Barghout was issued several additional warnings and finally charged with violating

the ordinance. On November 15, 1990, he was convicted and fined $400 plus $100 in court costs. Barghout then sought a declaratory judgment from the United States District Court for the District of Maryland that sections 49 and 50 of the ordinance violated the First and Fourteenth Amendments to the Constitution.

The district court thereafter certified two questions to the Court of Appeals of Maryland:

I.  Can an individual be convicted of violating Article 19, § 50 of the Baltimore City Code, if he or she sincerely believes that his or her conduct conforms to kosher requirements, even though the City inspector may disagree, or even though the individual's conduct might in fact be violative of religious laws?

II. Does Article 19, § 50 of the Baltimore City Code violate Article 36 of the Declaration of Rights of the Constitution of Maryland?

*Barghout v. Mayor,* 325 Md. 311, 600 A.2d 841, 841–42 (1992). The Court of Appeals of Maryland answered both questions in the negative. *Id.* 600 A.2d at 845, 849.

After reviewing the answers certified from Maryland's highest court, the federal district court[1] held the ordinance violates the Establishment Clause, finding its primary defect in its excessive entanglement of civil and religious authority. Although the court recognized that the three-prong test of *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), is "no more than a helpful sign post," it relied upon the *Lemon* test in its analysis. *Barghout v. Mayor of Baltimore,* 833 F.Supp. 540, 545 (D.Md.1993) (quoting *Mueller v. Allen,* 463 U.S. 388, 394, 103 S.Ct. 3062, 3066–67, 77 L.Ed.2d 721 (1983)). The court held that the ordinance has a "plausible secular purpose" in the prevention of fraud and therefore satisfies the first prong of the *Lemon* test.[2] *Id.* at 545–

---

1. The Honorable Benson Everett Legg, United States District Judge for the District of Maryland, presiding.

2. The court indicated this analysis was not free from doubt, citing *Ran–Dav's County Kosher, Inc.*

*v. New Jersey,* 129 N.J. 141, 608 A.2d 1353, 1366 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993), which observed "[t]he regulations may have been designed to assure truth in marketing, but the truths being marketed are, in essence, religious truths."

46. The court found, however, adopting the reasoning of the New Jersey Supreme Court in *Ran–Dav's*, 608 A.2d at 1364, that the ordinance violated the second prong of the *Lemon* test because it protects "the tenets and rituals of Orthodox Judaism"[3] and therefore has the effect of advancing a particular religion. *Id.* at 550. Finally, in holding that the ordinance also violated the third prong of the *Lemon* test, the district court observed the principal defect of the ordinance lies in its creation of excessive entanglement of religious and secular authorities because "the regulations impose a wholly religious standard for compliance" and require "the excessive involvement of specific religious organizations and figures in interpreting and enforcing those standards." *Id.* at 546. Based on the foregoing reasoning, the district court granted summary judgment in favor of Barghout, declared the ordinance unconstitutional, and enjoined its enforcement.[4] This appeal followed; we affirm.

## ANALYSIS

At least twenty-one states have adopted laws prohibiting the mislabeling of kosher food.[5] Only one state has struck down its kosher food law as in violation of the United States Constitution; the New Jersey Supreme Court invalidated its kosher food consumer fraud law in *Ran–Dav's*, 608 A.2d at 1353.[6] In *Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925), the United States Supreme Court upheld New York's kosher food consumer fraud statute against a challenge launched by butchers who claimed the term kosher was unconstitutionally vague.[7] In holding the

3. The district court acknowledged differences between the various sects of Judaism in the observance of kashrut:

> Although Conservative and Orthodox Jews generally agree on the standards of kashrut, they differ in their interpretations of specific provisions. Some Reform Jews follow various rules of kashrut, but they generally do not regard kashrut as binding. This disagreement among some of the various Jewish sects affects determinations about the kosher status of particular foods and methods of food preparation. For example, some Jews consider swordfish to be kosher while others disagree. Numerous other examples of kosher interpretive disagreement also exist.

*Barghout*, 833 F.Supp. at 544 (citations omitted).

4. The district court's original order also declared Barghout's conviction in state court unconstitutional. On the City's subsequent motion to vacate, however, the court vacated that portion of the original order. *Barghout v. Mayor of Baltimore*, 856 F.Supp. 250, 251 (D.Md.1994). Also in response to the City's motion to vacate, the court found the City had waived its argument that Barghout lacked standing to challenge the ordinance because he sold his business some time after he was convicted, but before the district court issued its order and opinion. *See id.* The City has not challenged that finding of the district court on appeal, and Barghout is apparently once again the owner of a Yogurt Plus shop selling kosher food in Baltimore.

5. *See* Ariz.Rev.Stat.Ann. § 36–942 (1993); Ark. Code Ann. § 20–57–401 (1991); Cal.Penal Code § 383b (1988); Conn.Gen.Stat. § 53–317 (1985); Ga.Code Ann. § 26–2–331 (1982); Ill.Rev.Stat. ch. 410, para. 645/1 (1993); Ky.Rev.Stat.Ann. § 367.850 (1993); La.Rev.Stat.Ann. § 40:608.2 (1992); Md.Code Ann., Com. Law, § 14–903 (1990); Mass.Gen.L. ch. 94, § 156 (1985); Mich. Comp. Laws § 750.297e (1991); Minn.Stat. § 31.651 (1981); Mo.Rev.Stat. § 196.165 (1993); N.Y. Agric. & Mkts. Law § 201–a (1992); Ohio Rev.Code Ann. § 1329.29 (1993); 18 Pa. Cons. Stat. § 4107.1 (1983); R.I. Gen. Laws § 21–16–1 (1989); Tex.Bus. & Com.Code Ann. § 17.822 (1987); Va.Code Ann. § 18.2–236 (1988); Wash. Rev.Code § 69.90.020 (1994); Wis.Stat. § 97.56 (1990).

6. New York and California courts have upheld kosher food consumer fraud laws against constitutional challenges claiming that those laws are void for vagueness. *See Erlich v. Municipal Court*, 55 Cal.2d 553, 11 Cal.Rptr. 758, 360 P.2d 334 (1961); *People v. Atlas*, 183 A.D. 595, 170 N.Y.S. 834 (1918), *aff'd*, 230 N.Y. 629, 130 N.E. 921 (1921). In the only state case other than *Ran–Dav's* to address an Establishment Clause challenge to a kosher food consumer fraud law, *Sossin Systems, Inc. v. City of Miami Beach*, 262 So.2d 28, 29–30 (Fla.Dist.Ct.App.1972), the court upheld the municipal ordinance, stating that it was "unable to view this ordinance as a legislative enactment establishing or respecting the establishment of a religion," without further elaboration.

7. The word kosher is derived from the Hebrew "kashrut" and means "fit" or "ritually correct" according to Jewish dietary laws. *Ran–Dav's*, 608 A.2d at 1355. The district court opinion and the parties, in their briefs to this Court, rely on various treatises and authorities on kosher food preparation and Judaism. We set forth a portion of that material as background information only. According to the *Encyclopedia of Religion*, the rules of kashrut are derived from Biblical statute, rabbinic interpretation, rabbinic legislation, and custom. 8 *Encyclopedia of Religion* 271 (1987).

term was not so vague as to violate the Due Process Clause, the Court did not address whether the law was constitutional under the religion clauses of the First Amendment because the Supreme Court had yet to determine that the First Amendment applied to the states.[8]

The Establishment Clause of the First Amendment provides, in relevant part, that

> The Biblical source of the laws of kashrut are said to be found mainly in the Old Testament books of Leviticus, Deuteronomy, Genesis, and Exodus. *Id.* The Jewish dietary laws differentiate between animals fit for consumption and those that are not. 6 *Encyclopaedia Judaica* 28 (1971). Animals fit for consumption must be slaughtered in a certain manner in order to conform to the dietary laws. The slaughter must be performed by a shohet, who is a butcher specially trained in the Jewish dietary laws. *Id.* at 27–28. The animal must be slaughtered with an extremely sharp knife in such a manner as to sever both the esophagus and trachea in one continuous stroke, in order to minimize the pain to the animal. 8 *Encyclopedia of Religion* 271 (1987).
>
> In addition, the consumption of blood is prohibited by the dietary laws, and in order to ensure blood is not consumed, the laws dictate methods of slaughtering animals and meat preparation. 6 *Encyclopaedia Judaica* 28 (1971). Jewish dietary law also forbids the consumption of meat and dairy products together. *Id.* at 40.
>
> Judaism in the United States can be divided generally into the Reform, Conservative, Orthodox, and Reconstructionism movements. 8 *Encyclopedia of Religion* 204 (1987). The Orthodox and Conservative sects both require the observance of kashrut. *Id.* at 272. Some Reform Jews observe various rules of kashrut, but Reform Judaism generally does not regard the rules as binding. 6 *Encyclopaedia Judaica* 27 (1971).
>
> Kosher food products are consumed by both Jews and non-Jews. A Washington Post article reported that "[a]lthough precise figures are hard to come by, . . . kosher marketing officials estimate there may be as many as six million Americans who seek out kosher foods in the supermarket. Of these, only 1.5 million are Jewish." Caroline E. Mayer, "Who's Keeping Kosher Now," *Wash. Post,* September 27, 1989, at E–1. Many non-Jews seek out kosher food because they believe it is healthier. *See Id.*

**8.** *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (recognizing for the first time that the Establishment Clause and Free Exercise Clause are applicable to the states through the Fourteenth Amendment). Although *Hygrade* did not address the constitutionality of the New York statute under the First Amendment, the Court set forth the argument, relied on by the City in the present case, that the statute was not invalid because butchers and merchants

"Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. It is applicable to the states through the Fourteenth Amendment's Due Process Clause. In assessing the facial challenge to the Baltimore ordinance, we apply the three factors articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[9]

> "are not required to act at their peril but only to exercise their judgment in good faith, in order to avoid coming into conflict with the statutes." *Id.* at 501, 45 S.Ct. at 142. The City also points to the Court's holding that "the term 'kosher' has a meaning well enough defined to enable one engaged in the trade to correctly apply it." *Id.* at 502, 45 S.Ct. at 142.

**9.** The district court's analysis was based solely on the *Lemon* test. The court did not discuss the case of *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), in terms of whether the ordinance presents a denominational preference requiring the application of strict scrutiny. The district court did examine the ordinance under the second prong of the *Lemon* test and found the ordinance had the effect of advancing the Orthodox Jewish religion. *Barghout,* 833 F.Supp. at 550. In this sense, the court held that the ordinance unconstitutionally endorses Orthodox Judaism. The City, in its appellate brief, does not discuss the ordinance under *Larson,* undoubtedly because the district court did not rest its decision on that basis. The amicus brief of the National Jewish Commission on Law and Public Affairs ("COLPA") urges that the term "kosher" is universally understood to refer to the Orthodox standard and that differences in interpretation are minimal and insignificant. The district court found that different sects of Judaism "generally agree on the standards of kashrut," but "differ in their interpretations of specific provisions." *Id.* at 544. This statement of the district court does not clearly indicate whether it found all sects of Judaism rely on the Orthodox standard.

Barghout argues in his brief that the ordinance's adoption of the Orthodox rules and regulations law is an intra-faith denominational preference requiring the application of strict scrutiny. He relies on the Supreme Court's decision in *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). Contrary to the suggestion of Judge Luttig, I find all of the various sects of the Jewish faith agree that kosher standards are determined by reference to Orthodox Jewish law. The mere fact that various sects may have different interpretations does not create an intra-faith dispute as to the basic meaning of what is and is not kosher. For example, the amicus brief filed by COLPA cites a portion of the brief filed in the *Ran–Dav's* litigation by the

Section 49 of the ordinance creates the Bureau of Kosher Meat and Food Control, required by law to consist of three duly ordained Orthodox Rabbis and three laymen chosen from a list submitted by two Orthodox associations. The City defends the role of the Bureau, arguing that these "experts" merely advise civic authorities of violations and hold no real power and that, in any event, even if section 49 is unconstitutional, it may be severed from the remainder of the ordinance, thereby saving the substantive provisions of section 50. We must reject these arguments. First, we think it clear that section 49 is on its face unconstitutional in that it fosters excessive entanglement of religious and secular authority by vesting significant investigative, interpretive, and enforcement power in a group of individuals based on their membership in a specific religious sect. The Supreme Court has made clear that the Establishment Clause does not permit legislative bodies to expressly delegate discretionary governmental functions to religious organizations or their members.

In *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), the Court struck down a Massachusetts zoning statute that permitted a church to veto the issuance of a liquor license to any establishment located within a 500–foot radius of the church. In holding the law violated the Establishment Clause, the Court found the statute had the primary effect of advancing religion because "[t]he churches' power under the statute [was] standardless" and "the mere appearance of a joint exercise of legislative authority by Church and State provides significant benefit to religion in the minds of some by reason of the power conferred." *Id.* at 125–26, 103 S.Ct. at 511. The Court also concluded the statute created excessive entanglement of religious and secular affairs by "enmesh[ing] churches in the exercise of substantial governmental powers...." *Id.* at 126, 103 S.Ct. at 512. Using language that clearly illustrates the main defect in the Baltimore ordinance, the Court emphasized that "[u]nder our system the

---

Anti–Defamation League of B'nai B'rith which states as follows:

> Even though some branches of Judaism sanction the consumption of nonkosher food, all accept the same code of Jewish law as the source of kosher dietary requirements.

Amicus brief for COLPA at 9 (quoting Amicus Brief for Anti–Defamation League of B'nai B'rith at 8, *Ran–Dav's County Kosher, Inc. v. New Jersey*, 129 N.J. 141, 608 A.2d 1353 (1992) (No. 32–525)). In addition, COLPA attaches to its brief the introductory statement from another amicus brief filed in the *Ran–Dav's* litigation. That statement reads as follows:

> Amici, the New Jersey Association of Reform Rabbis, the Reconstructionist Rabbinical Association, the New Jersey Region of the Rabbinical Assembly, and the Rabbinical Council of New Jersey, represent the entire spectrum of Jewish religious practice, ranging from the most liberal to the most traditional. The four rabbinic organizations, comprised of rabbis serving more than 200,000 Jews within this State, have joined together in this action to refute the contention of appellants that, through the New Jersey Kosher Food Regulations ("Regulations"), the State of New Jersey has endorsed Orthodox requirements to the prejudice of those of the other branches of Judaism. In point of fact, with minor exceptions, not relevant to the instant case, relating to wine, hard cheeses and certain fish *, all branches of Judaism accept the kosher requirements which have been developed in the Orthodox tradition over the centuries as the standard applicable to all, whether liberal or traditional in observance.
>
> * Nothing in the Regulations would prohibit a vendor from advertising that the wine, hard cheeses or fish being sold by it are Kosher under Conservative standards.

Amicus Brief for the New Jersey Association of Reform Rabbis et al., Introductory Statement, *Ran–Dav's County Kosher, Inc. v. New Jersey*, 129 N.J. 141, 608 A.2d 1353 (1992) (No. 32–525).

Although I am cognizant of the statement set down in *Hernandez v. Commissioner*, 490 U.S. 680, 695, 109 S.Ct. 2136, 2146–47, 104 L.Ed.2d 766 (1989), that our initial examination should be to determine whether the ordinance creates a denominational preference, I have hesitated to do so in this opinion because the district court approached the question under the *Lemon* test and the City's brief does not address the denominational-preference issue. Moreover, I find the record totally inadequate to determine whether there is a meaningful intra-faith dispute over the meaning of kosher. COLPA provides material supporting the view that all sects of Judaism rely on the Orthodox standard. This material is not challenged by Barghout other than through legal argument. Thus, because neither the district court nor the City addressed this issue, because the district court made no specific factual finding as to whether all sects of Judaism rely on the Orthodox standard, and because I find the ordinance fosters obvious excessive entanglement, I do not address whether the ordinance creates an intra-faith denominational preference.

choice has been made that government is to be entirely excluded from the area of religious instruction *and churches excluded from the affairs of government." Id.* at 126, 103 S.Ct. at 512 (quoting *Lemon,* 403 U.S. at 625, 91 S.Ct. at 2117).

The Court's recent decision in *Board of Education v. Grumet,* —— U.S. ——, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994), reaffirms and extends *Larkin* by making clear that a legislature not only may not expressly delegate governmental functions to the governing body of a church, but also may not otherwise "identif[y] ... recipients of governmental authority by reference to doctrinal adherence." *Id.* at ——, 114 S.Ct. at 2489. In *Grumet,* the New York legislature enacted a special statute constituting the Village of Kiryas Joel, which is populated entirely by members of the Satmar Hasidim sect of Judaism,[10] as an independent school district. The Court held as follows:

> [T]he statute creating the Kiryas Joel Village School District, departs from [the] constitutional command [of the Establishment Clause] by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally.

*Id.* at ——, 114 S.Ct. at 2487.

Relying on *Larkin,* the Court found that although the statute did not expressly delegate governmental authority based on religious affiliation, because the village boundaries were drawn "so as to exclude all but Satmars, and ... the New York Legislature was well aware that the village remained exclusively Satmar" when it enacted the legislation, the statute effectively vested governmental authority based on religious criterion. *Id.* at ——, 114 S.Ct. at 2489. The Baltimore ordinance at issue here *explicitly* delegates governmental authority to individuals based on their membership in a specific sect of a specific religion, i.e. Orthodox Judaism. The teaching of both *Larkin* and *Grumet* is that the Establishment Clause forbids the "fusion of governmental and religious functions," and that "a state may not delegate its civic authority to a group chosen according to a religious criterion." *Grumet,* —— U.S. at ——, 114 S.Ct. at 2488 (quoting *Larkin,* 459 U.S. at 126, 103 S.Ct. at 512). There should be little doubt that section 49 of the Baltimore ordinance runs afoul of these principles.[11]

■ Moreover, the ordinance cannot be saved, as the City urges, by severing portions of section 49, or all of section 49, from the remainder of the ordinance. Sections 49 and 50 are integrally related in that adoption of the Orthodox rules and regulations as the standard for compliance in section 50 makes city officials dependent upon members of that faith to interpret and apply the standard. Simply put, even if membership in the Bureau were not restricted to adherents of Orthodox Judaism, or even if there were no

---

**10.** As part of their religious practices, the residents of the Village avoid assimilation into mainstream culture, speak Yiddish as their primary language, and dress in a distinctive manner. *Grumet,* —— U.S. at ——, 114 S.Ct. at 2485. The Village maintains private schools for the education of its children, but those schools do not provide special education services. *Id.* Thus, disabled children within the Village are either forced to attend public schools outside the Village, which causes them great distress because of their cultural and religious differences, or go without special education. It was in response to that problem that the New York legislature enacted the statute which became the object of the *Grumet* litigation. *Id.* at ——–——, 114 S.Ct. at 2485–86.

**11.** The *Larkin* and *Grumet* courts did not necessarily base those decisions solely on the excessive entanglement prong of the *Lemon* test. In *Lar-*

*kin,* 459 U.S. at 125–26, 103 S.Ct. at 511–12, the Court relied on both the second and third prongs of the *Lemon* test in finding the statute unconstitutional. The *Grumet* Court did not expressly rely on the *Lemon* test at all. Nevertheless, until the Supreme Court overrules *Lemon* and provides an alternative analytical framework, this Court must rely on *Lemon* in evaluating the constitutionality of legislation under the Establishment Clause. *See Rosenberger v. Rector of Univ. of Va.,* 18 F.3d 269, 282 n. 30 (4th Cir.1994) (noting that although the Court's reliance on *Lemon* has not been consistent, *Lemon* has not been overruled), *rev'd on other grounds,* —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). In our view, the constitutional infirmities of the legislation at issue in both *Larkin* and *Grumet,* as well as in this case, are addressed most directly by the third prong of the *Lemon* test.

Bureau at all, section 50's adoption of the Orthodox rules inevitably requires the intimate involvement of members of that faith, and the leaders of that faith, in discerning the applicable standard.[12]

In *Aguilar v. Felton*, 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), the Supreme Court concluded that New York City's use of federal funds to pay the salaries of public school employees who taught in parochial schools was a violation of the Establishment Clause. In so holding, the Court found that the need for city officials to police the use of the funds in parochial schools to ensure the funds were not used to religious ends would create excessive entanglement of church and state officials. *Id.* at 409–10, 105 S.Ct. at 3236–37. The Court stated "the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." *Id.* at 410, 105 S.Ct. at 3236 (quoting *McCollum v. Board of Educ. of School Dist. No. 71*, 333 U.S. 203, 212, 68 S.Ct. 461, 465–66, 92 L.Ed. 649 (1948)). This case presents the reverse of the problem in *Aguilar*. In *Aguilar*, there was a danger that the state might interfere in the administrative affairs of parochial schools. Here, there is a danger that sectarian authority, i.e. Orthodox Rabbis, will become excessively involved in the investigation and prosecution of violations of the ordinance.

If section 49 were severed from the rest of the ordinance, and secular authorities did not rely on members of the Orthodox Jewish faith to determine compliance with the ordinance, those secular officials would be left to determine how Orthodox Judaism defines the rules of kashrut.[13] City officials or municipal courts would have to determine the Orthodox standards of kashrut rather than rabbinic authority in order to enforce the ordinance. This is clearly not permitted by our Establishment Clause jurisprudence. *See Aguilar,* 473 U.S. at 409–10, 105 S.Ct. at 3236–37 ("When the state becomes enmeshed with a given denomination in matters of religious significance," the "freedom of even the adherents of the denomination is limited by the governmental intrusion into sacred matters."); *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 715, 101 S.Ct. 1425, 1430–31, 67 L.Ed.2d 624 (1981) ("Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses."); *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 451, 89 S.Ct. 601, 607, 21 L.Ed.2d 658 (1969) ("To reach those questions would require the civil courts to engage in the forbidden process of interpreting and weighing church doctrine.").

The City argues that because the Maryland Court of Appeals construed the ordinance as prohibiting the prosecution of those who sincerely believe their food products are kosher, no city official or court will be required to engage in the process of determining the meaning of the term kosher, and the ordinance is therefore constitutional. We cannot agree. Whether prosecution under the ordinance focuses on the subjective intent of the vendor, or on the vendor's compliance with the Orthodox standards of kashrut, the ordinance still fosters excessive entanglement between city officials and leaders of the Orthodox faith with each and every prosecution.[14]

---

**12.** In a survey conducted in 1972, state authorities responding to a questionnaire on the enforcement of laws regulating consumer fraud in the sale of kosher food reported "heavy reliance on local rabbinic authorities." Daniel J. Elazar & Stephen R. Goldstein, *The Legal Status of the American Jewish Community*, 73 Am. Jewish Y.B. 3, 40 (1972) ("Dependence on rabbinic interpretation was almost unanimously affirmed by the states responding to our questionnaire.").

**13.** We do not hold that the mere incorporation of a religious standard in a statute automatically violates the Establishment Clause. *See Jones v.*

*Butz*, 374 F.Supp. 1284, 1292 (S.D.N.Y.), *aff'd*, 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974). Rather, under the particular circumstances of this case, the adoption of the Orthodox standard creates excessive entanglement of church and state authorities.

**14.** In *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), several individuals were prosecuted under a neutrally worded mail order fraud statute for using the mails to solicit funds for a movement claiming Guy Ballard, known as Saint Germaine, was a divine entity with the power to heal the sick. Ballard's

Finally, although our decision is principally based on our finding that the ordinance creates excessive entanglement of religious and secular authority, we also analyze the ordinance under the first and second prongs of the *Lemon* test. In determining whether the ordinance has a secular purpose, we note that this first prong of the *Lemon* test is a fairly low hurdle. A legislative enactment has no secular purpose only if "there [is] no question that the statute or activity was motivated wholly by religious considerations." *Lynch v. Donnelly,* 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). The City articulates the secular purpose of this legislation as the prevention and punishment of consumer fraud in the sale of kosher food. We agree that the purpose of this legislation is primarily to protect consumers from fraud in the sale of kosher food, and it thus satisfies the first prong of the *Lemon* test.

The second prong of *Lemon* considers whether the ordinance has the primary effect of advancing or endorsing religion. The question here is not the subjective intent of the Baltimore City Council in enacting the ordinance, but whether the objective effect of its passage is to suggest government preference for a particular religious view or for religion in general. "In proscribing all laws 'respecting an establishment of religion,' the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally." *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 8, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989). The government must appear neutral in matters of religious significance. *Grumet,* —— U.S. at ——, 114 S.Ct. at 2487; *Roemer v. Maryland Pub. Works Bd.,* 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976).

Although the City has not expressly endorsed Orthodox Judaism or encouraged its practice by passing the ordinance, the incorporation of the Orthodox standard creates an impermissible symbolic union of church and state. As the *Larkin* Court observed, "the mere appearance of a joint exercise" of authority between religious and secular authorities creates a symbolic benefit for the religious sect, in this case Orthodox Judaism, in which the power is vested. *Larkin,* 459 U.S. at 125, 103 S.Ct. at 511.

The City relies in part on the Supreme Court's cases concerning government sponsorship of religious holiday displays in arguing that the Baltimore ordinance does not have the primary effect of advancing or endorsing religion. As those cases make clear, "[e]very government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch v. Donnelly,* 465 U.S. 668, 694, 104 S.Ct. 1355, 1370, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). In *Lynch,* 465 U.S. at 685, 104 S.Ct. at 1365–66, the Court held that the inclusion of a creche in a city's holiday display along

---

associates were prosecuted for fraud under the statute, but the district court refused to put to the jury the truth or falsity of the defendants' statements, limiting the inquiry to whether the defendants had acted on a good faith belief in the truth of their statements. *Id.* at 81–82, 64 S.Ct. at 883–84. On appeal, the Court of Appeals reversed and ordered a new trial, finding that in order to convict the Ballards, the government had to show that the statements they made were false. *Id.* at 83, 64 S.Ct. at 884–85. The Supreme Court reversed the decision of the Court of Appeals and held the district court properly kept the question of the truth or falsity of the defendants' religious beliefs from the jury because "[w]hen the triers of fact undertake that task, they enter a forbidden domain." *Id.* at 87, 64 S.Ct. at 887. On remand, the Court of Appeals let the convictions stand. *See Ballard v. United States,* 152 F.2d 941, 943 (9th Cir.1945). The Supreme Court reversed again, this time

because women were intentionally excluded from the grand jury. *See Ballard v. United States,* 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946). The majority opinion did not address the defendants' claim that their conviction based on insincerity alone violated the Free Exercise Clause.

This case presents a totally different question from the one at issue in *Ballard.* In *Ballard,* the statute was neutral and not directed at any religiously significant conduct. The issue here is whether the City can incorporate a wholly religious standard for compliance with a consumer fraud statute when that standard is dictated by a particular religious sect. As previously discussed, we hold that it cannot, for to do so requires excessive interaction of religious and secular authorities and the delegation of substantial secular power to individuals based on their membership in that particular religious sect.

with other secular symbols of the holiday such as Santa Claus, Christmas trees, and candy-striped poles, did not constitute an establishment of religion. Several years later in *County of Allegheny v. A.C.L.U.*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Court held that the display of a creche in a prominent location in a government building without other secular symbols present was a violation of the Establishment Clause. *Id.* at 601–02, 109 S.Ct. at 3105–06. A majority of the Court concluded that a menorah, in a less prominent position and accompanied by a Christmas tree, did not violate the Establishment Clause. *Id.* at 620–21, 109 S.Ct. at 3115–16. The City points to these decisions, both of which upheld some use of religious symbolism in governmental affairs, in urging that the kosher food law's advancement of the Jewish faith is merely "remote and incidental."

In examining the particular effect of this ordinance, we note that Baltimore's City Code includes general ordinances concerning false advertising and fraud, but the kosher food ordinance is not included under those headings, but is considered under a separate section labelled "Kosher Meat" which is devoted exclusively to fraud in the sale of kosher meat and other kosher food products. No other particular type of consumer fraud is singled out for separate treatment. Thus, although the city council may have a valid secular purpose for the ordinance, the fact that consumer fraud in the sale of kosher food is treated separately, more comprehensively, and is given its own enforcement mechanism contributes to our conclusion that

the primary effect of the ordinance is the advancement and endorsement of the Jewish faith, and in particular the Orthodox Jewish faith.

For the foregoing reasons, the decision of the district court is affirmed.[15]

*AFFIRMED.*

LUTTIG, Circuit Judge, concurring in the judgment:

I agree with Judge Lay that the Baltimore City ordinance at issue in this case is unconstitutional. However, I believe the ordinance is invalid because it facially favors one sect of a faith over other sects of that faith, in violation of the most fundamental tenet of the Establishment Clause that the imprimatur of the state shall not directly or indirectly be placed upon one religious faith over another or upon one denomination of a faith over another. *See Larson v. Valente*, 456 U.S. 228, 246, 102 S.Ct. 1673, 1684, 72 L.Ed.2d 33 (1982); *see also Allegheny County v. Greater Pittsburgh ACLU*, 492 U.S. 573, 605, 109 S.Ct. 3086, 3107, 106 L.Ed.2d 472 (1989) ("Whatever else the Establishment Clause may mean ... it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed...."); *Wallace v. Jaffree*, 472 U.S. 38, 113, 105 S.Ct. 2479, 2519, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) ("The [Establishment] Clause was ... designed to stop the ... Government from asserting a preference for one religious denomination or sect over others."). Because we are required to first consider, and resolve, the issue of

---

**15.** We note that our decision does not render fraudulent vendors of kosher food immune to prosecution. The City can prevent fraud in the sale of kosher food in a less restrictive and neutral manner by simply requiring that any vendor engaged in the sale of kosher food state the basis on which the food is labeled kosher. Barghout points out in his brief to this Court that there already exist private supervisory agencies that certify food as kosher. For example, a "U" symbol is often used on kosher food to denote the approval of the Union of Orthodox Jewish Congregations of America, and the "K" symbol denotes the approval of the Organized Kashrut Laboratories. Anyone offering for sale food marked with one of these symbols when the product had not in fact been approved by the relevant authority could be convicted of consum-

er fraud without any intrusion into the internal affairs of the Jewish faith, and without requiring the involvement of adherents of Orthodox Judaism in interpreting a city ordinance. Moreover, if an individual vendor did not wish to be certified by one of these organizations, the vendor could simply post a notice detailing how the food is prepared or under what rabbinic authority. The consumer would then be in a position to decide if the manner of food preparation conforms to his or her own standards, whether that consumer is seeking out kosher food for religious or health-related reasons. *See Ran–Dav's*, 608 A.2d at 1366 (suggesting as an alternative to the law that the court invalidated that "[t]he regulation could require those who advertise food products as 'kosher' to disclose the basis on which the use of that characterization rests").

whether the ordinance facially differentiates among religions, *see Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 695, 109 S.Ct. 2136, 2146–47, 104 L.Ed.2d 766 (1989), and because I conclude that the ordinance does run afoul of the basic proscription against denominational preferences, I need not proceed to the *Lemon* analysis undertaken by Judge Lay.[1] "[T]he *Lemon v. Kurtzman* 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions … that discriminate *among* religions." *Larson,* at 252, 102 S.Ct. at 1687 (emphasis in original, citations omitted). Accordingly, I concur only in the judgment of the court.

Judge Lay implicitly assumes that "the term 'kosher' is universally understood to refer to the Orthodox standard" of Jewish dietary regulations. *See ante* at 1341 n.9 (citing Brief of *Amicus Curiae* National Jewish Commission on Law and Public Affairs [at 10] ("COLPA")).[2] On this assumption, he subjects the Baltimore kosher fraud ordinance to the test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and holds the ordinance unconstitutional because it "fosters excessive entanglement of religious and secular authority," *ante* at 1342, and because "the primary effect of

the ordinance is the advancement and endorsement of the Jewish faith, and in particular the Orthodox Jewish faith." *Ante* at 1346.

The various branches of Judaism define kosher differently, however, and, as one would expect, these differences are significant to adherents of the various sects of the faith. As the district court found, "Conservative and Orthodox Jews generally agree on the standards of kashrut, [but] they differ in their interpretations of specific provisions." *Barghout v. Mayor and City Council of Baltimore,* 833 F.Supp. 540, 544 (D.Md.1993) (citing 6 *Encyclopaedia Judaica* 27–45). The district court noted, for example, that "some Jews consider swordfish to be kosher while others disagree," and that "[n]umerous other examples of kosher interpretive disagreement also exist." *Id.* at 544. *See also Ran–Dav's County Kosher, Inc. v. State,* 129 N.J. 141, 608 A.2d 1353, 1356 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993) ("[T]here is considerable disagreement over what precepts or tenets truly represent the laws of kashrut … both within Orthodox Judaism and between Orthodox Judaism and other branches of Judaism.").[3] Indeed, appellants conceded at oral

---

1. In his concurring opinion, Judge Wilkins acknowledges that the Supreme Court has instructed that the *Larson* analysis should be undertaken first, *post* at 1349, but he asserts that the Court "has not always followed its own admonition." *Id.* (citing *Board of Educ. of Kiryas Joel v. Grumet,* —— U.S. ——, ——–——, 114 S.Ct. 2481, 2491–92, 129 L.Ed.2d 546 (1994)). In fact, the very reason that Justice Souter's opinion in *Grumet* did not garner a majority of the Court in its entirety was because it undertook a *Lemon*-like analysis in Part II–A that Justice O'Connor declined to join. *Grumet,* —— U.S. at ——–——, 114 S.Ct. at 2488–90. *See also id.* at ——–——, 114 S.Ct. at 2494–95 (Blackmun, J., concurring) (pointing out that Part II–A, while not mentioning *Lemon,* "relies upon several decisions … that explicitly rested on the criteria set forth in *Lemon*"); *id.* at ——–——, 114 S.Ct. at 2497–98 (O'Connor, J., concurring in part and concurring in the judgment) (joining all but Part II–A because the New York law at issue in the case, "rather than being a general accommodation, singles out a particular religious group for favorable treatment"); *id.* at ——–——, 114 S.Ct. at 2498–2500 (O'Connor, J.) (rejecting application of the *Lemon* analysis to the case). Thus, the Supreme Court has, to my knowledge, consis-

tently resolved Establishment Clause cases under a *Larson* analysis where a denominational preference is manifestly at issue.

2. Judge Lay indulges this assumption based, in part, upon an *amicus curiae* brief filed in the *Ran–Dav* case, in which the Anti–Defamation League of B'nai B'rith stated:

    Even though some branches of Judaism sanction the consumption of nonkosher food, all accept the same code of Jewish law as the source of kosher dietary requirements.

    *Ante* at 1341 n.9 (citing *Amicus* Brief for COLPA at 9 (quoting Amicus Brief for Anti–Defamation League of B'nai B'rith at 8, *Ran–Dav's County Kosher, Inc. v. New Jersey,* 129 N.J. 141, 608 A.2d 1353 (1992) (No. 32–525))). Of course, there can be universal agreement as to the *source* of kosher dietary requirements, and still be disagreement as to the *interpretation* of those requirements. As I explain below, it is in adopting the interpretation of one sect that the City of Baltimore has created a denominational preference.

3. *See also* Plaintiff's Response to Defendant's Motion to Dismiss at 5, *Barghout,* 833 F.Supp. 540 ("certain fish (swordfish), birds, hard cheeses, and wines are accepted by the Conservative

argument that "kosher means different things to different people." Oral Argument, Dec. 8, 1994. Given the differences between the understandings of what is and is not kosher within Judaism, the City, by defining kosher according to "the *orthodox* Hebrew religious rules and regulations and the dietary laws," Baltimore, Md., City Code, Art. 19, § 50 (1983 Repl.Vol.) (emphasis added), has unquestionably expressed an impermissible intrafaith denominational preference for Orthodox Judaism.

Even if, as Judge Lay assumes, the term "kosher" were understood by all persons of the Jewish faith as meaning in accord with the dietary laws of Orthodox Judaism, the Baltimore ordinance still represents a denominational preference, because it singles out Orthodoxy for special protection, *see, e.g., Barghout,* 833 F.Supp. at 546 ("the statutes provide a substantial religious benefit to those who adhere to 'orthodox Hebrew religious rules and dietary laws' "), while at the same time protecting not at all adherents of the Conservative or Reformed sects against fraud in the labeling of food products that meet their dietary requirements. As the district court recognized, "Conservative or Reform Jews might well object to the *status* conferred on Orthodox Jews, for the ordinance identifies ... orthodox Judaism as the recipient of civil authority for interpreting and applying the kosher standard." *Id.* at 549 (emphasis added).[4]

In *Larson v. Valente,* the Supreme Court summarily held that a Minnesota statutory provision exempting from the reporting requirements of the state's charitable solicitations Act only those religious organizations that receive more than fifty percent of their contributions from members "clearly grants denominational preferences," 456 U.S. at 246,

102 S.Ct. at 1684, because the provision "makes explicit and deliberate distinctions between different religious organizations." *Id.* at 247 n. 23, 102 S.Ct. at 1685 n. 23. The statute at issue in *Larson* did not even mention a particular religion by name; nonetheless, the Court determined that the statute created a denominational preference because "the provision effectively distinguishe[d] between well-established churches that have achieved strong but not total financial support from their members, on the one hand, and churches which are new and lacking in a constituency, or which, as a matter of policy, may favor public solicitation over general reliance on financial support from members, on the other hand." *Id.* at 247 n. 23, 102 S.Ct. at 1685 n. 23 (citing *Valente v. Larson,* 637 F.2d 562, 566 (8th Cir.1981)) (internal quotation marks omitted).

In the instant case, the denominational preference is even clearer. As Judge Lay recognizes, *ante* at 1338, the Baltimore City ordinance makes it a misdemeanor to sell, with intent to defraud, food products "falsely represent[ed] to be Kosher, ... or as having been prepared under, and/or ... sanctioned by the *orthodox Hebrew* religious rules and requirements or under the dietary laws." Art. 19, § 50 (emphasis added). The ordinance further specifies that:

> In order to comply with the provisions of this section[,] persons dealing with either kosher meat, meat preparations, food and/or food products only, or persons dealing with both kosher and non-kosher meat, meat preparations, food and/or food products *must adhere to and abide by the orthodox Hebrew religious rules and regulations and the dietary laws;* otherwise he shall be in violation of this section.

Hebrew movement, and a few Orthodox scholars, but rejected by the majority of observant Orthodox Jews"); Brief of *Amicus Curiae* ACLU of Maryland at 12–13, *Barghout,* 833 F.Supp. 540 (noting that a biblical passage forbidding consumption of the "sinew of the thigh vein" is interpreted differently by the Sephardim and Askenazim branches of the Orthodox sect, with one prohibiting consumption of hind quarters altogether, and the other permitting consumption if the hind quarters are "deveined properly."); 6 *Encyclopaedia Judaica* 27–45 (MacMillan Pub-

lishing Co.1971) (noting dispute over whether, *inter alia,* giraffe, turkey, guinea fowl, and pheasant are kosher).

4. Judge Lay apparently recognizes as much, see *ante* at 1341 n.9 (citing Amicus Brief for the New Jersey Association of Reform Rabbis et al., Introductory Statement, *Ran–Dav's County Kosher, Inc. v. New Jersey,* 129 N.J. 141, 608 A.2d 1353 (1992) (No. 32–525)), but does not appear to regard this disparate protection as constituting a denominational preference.

*Id.* (emphasis added). The ordinance, in sum, explicitly defines fraud by reference to the religious rules of a specific religious denomination.

A law that facially evidences such a denominational preference "must be invalidated unless it is justified by a compelling governmental interest ... and unless it is closely fitted to further that interest." *Larson,* at 247, 102 S.Ct. at 1685 (citing *Widmar v. Vincent,* 454 U.S. 263, 269–70, 102 S.Ct. 269, 274–75, 70 L.Ed.2d 440 (1981), and *Murdock v. Pennsylvania,* 319 U.S. 105, 116–17, 63 S.Ct. 870, 876–77, 87 L.Ed. 1292 (1943)). I assume that Baltimore's interest in protecting consumers from fraudulent labeling practices is compelling; I must conclude, however, that the ordinance passed assertedly to further that interest is not "closely fitted" to that end. *See, e.g., Larson,* 456 U.S. at 248, 102 S.Ct. at 1685 (assuming that state's "interest in protecting its citizens from abusive practices in the solicitation of funds for charity" was compelling, but finding that statutory provision at issue was not "closely fitted" to further that purpose). The ordinance does not simply prevent fraud in the religious labeling of foods—which could be accomplished through a provision that prohibits vendors from falsely claiming that their products have been certified by the respective religious authorities as conforming to their sect's dietary regulations—but rather singles out for protection the dietary rules of Orthodox Judaism, to the exclusion of other sects of the Jewish faith.

Because I conclude that the Baltimore City ordinance facially constitutes a denominational preference, and is not sufficiently tailored to meet the state's interest in protecting against consumer fraud, I would affirm the district court's invalidation of the ordinance without resort to the *Lemon* analysis undertaken by Judge Lay, about which I have reservations. In my view, for example, it may well be that the City could protect adherents of Judaism from commercial fraud in the marketing of kosher products, without impermissibly advancing religion, merely by eliminating the denominational preference that appears in the ordinance in question. It is precisely because of such a possibility that the Supreme Court has insisted that a facial denominational preference be addressed prior to invocation of *Lemon.*

WILKINS, Circuit Judge, concurring:

In determining whether a legislative enactment violates the Establishment Clause of the First Amendment of the Constitution by creating a denominational preference, the Supreme Court has indicated that the analytic framework supplied by *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), should first be employed. *Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 695, 109 S.Ct. 2136, 2146–47, 104 L.Ed.2d 766 (1989). If that inquiry results in a finding that no facial denominational preference exists, the tests established in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), should then be applied. *Hernandez,* 490 U.S. at 695, 109 S.Ct. at 2146–47. However, the Supreme Court has not always followed its own admonition. *See Board of Educ. v. Grumet,* —— U.S. ——, —— – ——, 114 S.Ct. 2481, 2491–92, 129 L.Ed.2d 546 (1994). Because I conclude that the ordinances at issue, Baltimore, Md., City Code art. 19, §§ 49–50 (1983), do not pass constitutional muster under either analysis, I agree with the conclusions of both Judge Lay and Judge Luttig.

Judge Lay and the district court correctly concluded that an application of *Lemon* demonstrates that the ordinances are unconstitutional. Although the ordinances have a secular purpose and thus satisfy the first prong of *Lemon,* in my view they fail the second and third prongs. The ordinances fail the second prong of *Lemon* because their principal effect is to establish religion by creating a symbolic union between church and state. *See Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 125–26, 103 S.Ct. 505, 511–12, 74 L.Ed.2d 297 (1982); *Ran–Dav's County Kosher, Inc. v. New Jersey,* 129 N.J. 141, 608 A.2d 1353, 1365 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993). With respect to the third prong of *Lemon,* § 50 creates an excessive entanglement because it requires an interpretation and determination of religious law (*i.e.,* whether the food represented to be kosher was, in fact, kosher) in deciding whether there has been a

violation. *See Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 445–52, 89 S.Ct. 601, 604–08, 21 L.Ed.2d 658 (1969); *United States v. Ballard,* 322 U.S. 78, 85–88, 64 S.Ct. 882, 885–87, 88 L.Ed. 1148 (1944). And, § 49 creates an excessive administrative entanglement. *See Larkin,* 459 U.S. at 126, 103 S.Ct. at 511–12.

I also agree with Judge Luttig that the ordinances are unconstitutional because they create a facial denominational preference and are not narrowly tailored to meet the interest of protecting against consumer fraud. *See Larson,* 456 U.S. at 244–51, 102 S.Ct. at 1683–84.